**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

Jerald Hammann,
　　　　　　　Plaintiff,

v.

Eyenovia, Inc., now known as
Hyperion DeFi, Inc., a Delaware corporation;
Michael Rowe;
John Gandolfo; and
Tsontcho "Sean" Ianchulev,
　　　　　　　Defendants.

Civil Action No. _____

---

**JURY TRIAL DEMANDED**

**COMPLAINT FOR VIOLATIONS**
**OF THE FEDERAL SECURITIES LAWS**
**AND NEW YORK COMMON-LAW FRAUD**

Plaintiff Jerald Hammann alleges the following upon personal knowledge as to his own acts, purchases, reliance, holdings, and communications, and upon information and belief as to all other matters, based on review of Eyenovia's public statements, SEC filings, FDA materials, investor presentations, press releases, public website materials, product labeling, historical trading information, and other publicly available information.

**I. NATURE OF THE ACTION**

1. This case arises from Defendants' repeated promotion of one ophthalmic drug-delivery device to investors while FDA was reviewing and

ultimately approved a materially different device for MydCombi, without clearly disclosing that the two devices were different. Plaintiff brings direct, purchase-based claims for his own investment losses and does not seek recovery for injury to Eyenovia or assert claims on its behalf.

2.      Eyenovia presented Optejet as its core proprietary platform. The Company associated Optejet with targeted ophthalmic drug delivery, improved administration and dosing adherence, smart-device functionality, broader product and partnership opportunities, scalable commercialization, and high-margin platform economics.

3.      On December 6, 2021, Eyenovia filed an investor presentation with the SEC that showed investors a sleek Optejet device and stated that MydCombi was under FDA review as a drug-device combination product. In context, the presentation conveyed that FDA was reviewing the same Optejet device Eyenovia showed and promoted to investors.

4.      FDA was not reviewing that device. FDA reviewed and approved a product-specific MydCombi cartridge/base configuration consisting of a prefilled MydCombi drug cartridge and a powered dispenser base intended for professional administration. That Approved Device differed materially from the Promoted Device shown to investors.

5.    The difference is visible in the exhibits. Exhibit A shows the Promoted Device from Eyenovia's December 6, 2021, SEC-filed presentation. Exhibit B shows the Approved Device from FDA-approved labeling and instructions for use. Exhibit C places the two devices in direct comparison.

6.    The distinction was not merely cosmetic. The devices differed in design, regulatory status, intended use, functionality, potential users, and commercial scope. The Approved Device was a product-specific, prefilled cartridge/base system for office or procedure use. The Promoted Device was associated with potential patient self-administration, daily or chronic use, use by children and other patients, smart-device pairing, reminders, dose tracking, data capture, use across multiple ophthalmic products and indications, broader partnerships, and a larger platform opportunity. The December 2021 presentation did not describe the Promoted Device as user-filled, and Plaintiff does not allege that it possessed that capability.

7.    Eyenovia did not clearly disclose before Plaintiff's purchases that the device shown to investors did not match the device constituent submitted to FDA with MydCombi. Subsequent disclosures showed that the Promoted Device—the configuration Eyenovia later described as its second-generation Optejet device—required additional FDA interaction, clinical bridging, validation, manufacturing, stability testing, and regulatory submission before MydCombi could be

3

transitioned into it. The later user-filled program was separate: the December 2021 presentation did not describe or promote user-fill capability.

8.    Plaintiff reviewed the December 6, 2021, presentation before purchasing 20,000 Eyenovia shares on December 16, 2021. He was seeking proprietary device companies capable of creating competitive barriers through patented and FDA-approved delivery technology and understood that MydCombi's FDA review would validate the Optejet device Eyenovia had shown investors.

9.    Plaintiff purchased another 40,580 shares on April 6, 2023, in anticipation of FDA's expected May 2023 action on the resubmitted MydCombi application. By then, the principal unresolved issue was understood to concern the device constituent, including human-factors validation, labeling, and safe and effective use of the dispenser. Plaintiff again believed FDA was reviewing the Promoted Device.

10.   On May 8, 2023, Eyenovia announced FDA approval of MydCombi and represented that MydCombi was the first approved product using its proprietary Optejet device and that the approval provided critical validation of the Optejet platform. The announcement reinforced the earlier misleading impression because it did not disclose that FDA had approved only the distinct, product-specific Approved Device.

11.    The truth emerged in stages. Eyenovia subsequently disclosed that MydCombi would need to be transitioned from the Approved Device into the second-generation Promoted Device through additional FDA-reviewed bridging, validation, manufacturing, stability testing, and regulatory work. Those disclosures confirmed that FDA approval of MydCombi was specific to the Approved Device and did not approve or validate the Promoted Device or its broader platform capabilities.

12.    Subsequent disclosures also revealed the economic importance of that distinction. Eyenovia stated that the second-generation Promoted Device had significantly lower manufacturing cost than the Approved Device, that early MydCombi commercialization generated flat or negative gross margins, and that improved economics depended on transitioning MydCombi into the Promoted Device and scaling its production.

13.    These disclosures confirmed that approval of the product-specific Approved Device was materially different from approval or validation of the broader device platform investors had been shown. The distinction affected regulatory status, functionality, addressable users and products, manufacturing cost, commercialization, margins, partnership opportunities, financing needs, and platform value.

5

14. Defendants knew, or were reckless in not knowing, the distinction. Eyenovia could not prosecute the MydCombi application, conduct human-factors work, communicate with FDA, prepare labeling, plan manufacturing, and launch the product without knowing which device FDA was reviewing and whether it matched the device shown to investors.

15. Plaintiff purchased 60,580 shares for $225,139.09 and has not sold them. He alleges that Defendants' misstatements and omissions inflated the purchase price and that the inflation was reduced or removed as the regulatory and economic distinction emerged.

16. Plaintiff asserts claims under Section 10(b) of the Securities Exchange Act of 1934 and SEC Rule 10b-5, Section 20(a) of the Exchange Act, and New York common-law fraud.

## II. JURISDICTION AND VENUE

17. Plaintiff brings this action under Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b); SEC Rule 10b-5, 17 C.F.R. § 240.10b-5; Section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a); and New York common-law fraud.

18. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 and Section 27 of the Exchange Act, 15 U.S.C. § 78aa(a).

19.     This Court has supplemental jurisdiction over Plaintiff's New York common-law fraud claim under 28 U.S.C. § 1367 because that claim forms part of the same case or controversy as Plaintiff's federal securities-law claims.

20.     Venue is proper in the Southern District of New York under Section 27 of the Exchange Act and 28 U.S.C. § 1391 because acts and transactions constituting the violations occurred in this District.

21.     At the time of the December 6, 2021, investor presentation and Form 8-K, Eyenovia maintained its principal executive office at 295 Madison Avenue, Suite 2400, New York, New York 10017.

22.     The December 6, 2021, Form 8-K stated that the attached corporate update presentation was intended for use with various investors and analysts. That investor presentation is one of the central misstatements alleged in this Complaint.

23.     The New York common-law fraud claim arises from the same New York-centered public-company communications to investors, including Eyenovia's SEC-filed investor presentation, its New York principal executive office, and statements concerning Optejet, MydCombi, and FDA review.

24.     Eyenovia common stock traded on Nasdaq under the ticker symbol EYEN, and Defendants' statements were disseminated into the national securities markets.

25.     Defendants used the means and instrumentalities of interstate commerce, including the mails, the internet, SEC filings, investor presentations, press releases, public websites, investor-relations materials, and national securities markets.

### III. PARTIES

26.     Plaintiff Jerald Hammann is an individual investor residing in Minnesota. Plaintiff purchased Eyenovia common stock after Defendants' alleged misstatements and omissions entered the market.

27.     On December 16, 2021, Plaintiff purchased 20,000 shares of Eyenovia common stock in Account ####9166 for $73,000.00, at an average price of $3.65 per share.

28.     On April 6, 2023, Plaintiff purchased an additional 40,580 shares of Eyenovia common stock across Accounts ####1678, ####9166, and ####4430 for $152,139.09, at an average price of approximately $3.75 per share.

29.     In total, Plaintiff purchased 60,580 shares of Eyenovia common stock for $225,139.09, at an average price of approximately $3.7164 per share.

30.     Plaintiff has not sold any of those shares. All shares remain held and were converted into Hyperion DeFi / HYPD shares.

31.     Defendant Eyenovia, Inc. was a Delaware corporation that traded on Nasdaq under the ticker symbol EYEN. Eyenovia later changed its name to

Hyperion DeFi, Inc. and now trades under the ticker symbol HYPD. Eyenovia/Hyperion is referred to herein as "Eyenovia," "Hyperion," or the "Company."

32.     Defendant Michael Rowe served as Eyenovia's Chief Operating Officer at the time of the December 6, 2021, investor presentation. Rowe later became Eyenovia's Chief Executive Officer and signed Eyenovia's March 31, 2023, Form 10-K as Chief Executive Officer and Principal Executive Officer. Rowe made the statements contained in filings he signed and public statements expressly attributed to him. On August 12, 2024, Rowe was expressly quoted concerning Eyenovia's FDA consultation, finalization of the second-generation Optejet device, and intended 2025 regulatory submission of that device with MydCombi as the lead product. That statement demonstrates Rowe's knowledge of the configuration-specific regulatory pathway.

33.     Defendant John Gandolfo served as Eyenovia's Chief Financial Officer and Secretary during the relevant period. Gandolfo signed the December 6, 2021, Form 8-K that attached the December 2021 investor presentation and stated that Eyenovia intended to use that presentation with investors and analysts. Gandolfo also signed Eyenovia's March 31, 2023, Form 10-K as Chief Financial Officer and Principal Financial and Accounting Officer. Gandolfo made the

9

statements contained in the SEC filings he signed and any public statement expressly attributed to him.

34.    Defendant Tsontcho "Sean" Ianchulev served as Eyenovia's Chief Executive Officer, Chief Medical Officer, director, and co-founder at the time of the December 6, 2021, investor presentation. The December 2021 presentation identified Ianchulev as Eyenovia's CEO, CMO, and co-founder.

35.    As Chief Executive Officer and Chief Medical Officer, Ianchulev had responsibility for Eyenovia's executive and medical communications concerning Optejet, MydCombi, and FDA review. Plaintiff alleges that he had authority over the substance of the December 2021 presentation concerning those subjects.

36.    Ianchulev had ultimate authority over Eyenovia's executive and medical statements concerning Optejet, MydCombi, and FDA review and signed Eyenovia's March 31, 2023, Form 10-K as a director. His executive and medical authority also gave him control over the Company's disclosures on those subjects.

## IV. DEFINITIONS USED IN THIS COMPLAINT

37.    For clarity, Plaintiff uses the following device terms in this Complaint.

38.    The "Approved Device" means the specific MydCombi cartridge/base dispenser configuration reviewed and approved by FDA with MydCombi. It consisted of a prefilled MydCombi drug cartridge and a powered

MydCombi/Optejet base and was intended for professional administration. It was materially different in appearance, design, regulatory status, intended use, and commercial function from the device Eyenovia had shown investors.

39.     The "Promoted Device" means the sleek Optejet device Eyenovia showed in investor and public-facing materials before Plaintiff's purchases, including the December 6, 2021, investor presentation. Plaintiff alleges that the Promoted Device was the configuration Eyenovia later described as its second-generation Optejet device. It did not match the Approved Device. Eyenovia associated the Promoted Device with smart-device pairing, dosage reminders, dose tracking, data capture, patient-oriented administration, compliance and adherence, and broad platform opportunities.

40.     A "User-Filled Device" or "UFD" means the separately described device concept that would permit a user to fill a cartridge from a separately supplied eyedrop bottle and attach it to a reusable base. The Promoted Device was not represented in the December 2021 presentation as possessing that capability.

## V. FACTUAL BACKGROUND

**A.     Optejet Was Central to Eyenovia's Investment Story**

41.     Eyenovia presented itself as an ophthalmic technology company built around its proprietary Optejet drug-delivery platform.

42. The Company described Optejet as a device capable of delivering medication to the ocular surface in a low-volume, targeted spray, rather than through traditional eye drops.

43. Eyenovia represented that Optejet could reduce drug and preservative exposure, reduce waste, improve dosing, improve administration, and support a broad pipeline of ophthalmic drug-device products.

44. In January 2024, Eyenovia titled an investor presentation "We Are the Optejet® Company" and stated that "Eyenovia (NASDAQ:EYEN) is the Optejet® Company."

45. The same January 2024 investor presentation described Eyenovia as developing ophthalmic drug-device therapeutics using its Optejet platform and emphasized Optejet's device platform technology, drug products, pipeline, revenue model, and related service capabilities.

46. Eyenovia's January 2024 SEC-filed narrative likewise stated that Eyenovia was developing topical ophthalmic medications using its novel, patented Optejet drug-device dispensing platform and that MydCombi represented the first FDA-approved drug in Optejet, providing important validation of the technology.

**B.    Plaintiff's Investment Thesis Was Based on Proprietary Device Approval**

47. Plaintiff purchased Eyenovia shares because Eyenovia presented itself as a proprietary ophthalmic drug-device platform company.

48.    Plaintiff was intentionally looking for companies whose drug delivery technology could create barriers to entry if approved or validated by FDA.

49.    Plaintiff saw and reviewed Eyenovia's December 6, 2021, investor presentation before purchasing Eyenovia shares on December 16, 2021.

50.    Plaintiff understood those statements and images to mean that FDA was reviewing MydCombi with the same Optejet device Eyenovia had shown and promoted to investors.

51.    Plaintiff did not know that FDA was reviewing and later approved a materially different MydCombi cartridge/base configuration.

52.    Had Plaintiff known before his December 16, 2021, or April 6, 2023, purchases that the FDA-reviewed device constituent differed materially from the Promoted Device, Plaintiff would not have purchased Eyenovia shares on the same terms.

## C.    December 2021: Eyenovia Visually Promoted an Optejet Device That Did Not Match the FDA-Reviewed MydCombi Device

53.    On December 6, 2021, Eyenovia filed a corporate investor presentation with the SEC.

54.    The December 2021 investor presentation used broad Optejet platform language and visually depicted an Optejet device as the Company's proprietary microdose array print technology designed for optimal drug delivery.

55.     The same presentation stated that MydCombi was under FDA review and that Eyenovia's microdose therapeutics were regulated as drug-device combination products.

56.     While the sleek Promoted Device was visually-different from the undisclosed Approved Device, the mismatch was also functional. The December 6, 2021, investor presentation represented in text that Optejet could be paired with smart devices to enable dosage reminders and tracking. The same presentation also represented that Eyenovia's intellectual-property protection covered data capture. The FDA-approved MydCombi labeling and instructions for use did not approve or describe smart-device pairing, dosage reminders, dose tracking, or data-capture functionality for the Approved Device.

57.     The December 2021 presentation also represented that Eyenovia's therapies could improve compliance and adherence and touted nearly 90% compliance among children using Optejet once daily. That was a materially broader patient-use and market-scope message than the Approved Device could support. MydCombi was an office-based, professionally administered mydriasis product, and the Approved Device was not a patient-used device for daily or chronic self-administration by children or other patients.

58.     But the device image shown in the December 2021 investor presentation did not match the MydCombi dispenser configuration later shown in FDA review materials and approved labeling.

59.     The FDA-reviewed MydCombi configuration involved a specific MydCombi drug cartridge and Optejet/MydCombi dispenser base. The approved product was not the same as the Promoted Device.

60.     Eyenovia did not clearly disclose to investors that the Optejet device image being used to promote the platform did not depict the same MydCombi device configuration for which FDA approval was being sought.

61.     Eyenovia also did not clearly disclose that the device visually promoted to investors was not the MydCombi configuration under FDA review. The later disclosures are relevant because they showed that moving MydCombi from the Approved Device into the Promoted Device required separate development and FDA-reviewed regulatory work.

**D.     By April 2023, the Pending FDA Action Was Understood as a Device-Constituent / Optejet Dispenser Event**

62.     By April 2023, Plaintiff understood the principal unresolved issue in the resubmitted MydCombi NDA to concern the device constituent and Optejet dispenser portion of the MydCombi drug-device combination product.

63.     FDA had previously issued a Complete Response Letter after treating MydCombi as a drug-device combination product. The additional FDA process

concerned device-related issues, including the Optejet dispenser, human-factors validation, labeling, and safe and effective use of the proposed device configuration.

64. Eyenovia and public materials represented that FDA had requested additional device testing related to the Optejet dispenser and that no additional clinical studies of MydCombi were requested.

65. Eyenovia later resubmitted the MydCombi NDA, and FDA assigned a May 8, 2023, PDUFA action date.

66. As a result, investors reasonably understood the May 2023 FDA action date as a device-validation event for Optejet within the MydCombi drug-device combination product, not merely as a drug-efficacy event.

67. Plaintiff purchased additional Eyenovia shares on April 6, 2023, because he believed that FDA approval would validate the Optejet device platform Eyenovia had shown and promoted to investors.

68. Plaintiff did not know that the device constituent submitted to FDA, reviewed by FDA, and later approved by FDA did not match the Promoted Device. Plaintiff understood Eyenovia's public statements and device imagery to mean that FDA was reviewing and would potentially approve the same Optejet device Eyenovia had shown investors.

16

69.    Had Plaintiff known that the pending FDA action concerned the materially different Approved Device, rather than the Promoted Device, Plaintiff would not have purchased additional Eyenovia shares on April 6, 2023, on the same terms.

**E.    Eyenovia Later Promoted Patient Self-Administration and Use Imagery for the Promoted Device**

70.    After the December 2021 investor presentation, Eyenovia and Eyenovia-related public materials also promoted patient self-administration and use messaging for the Promoted Device.

71.    Eyenovia had long represented that Optejet could support self-administration by patients and could improve ease of use compared with traditional eye drops.

72.    By August 2022, Eyenovia publicly promoted the Optejet dispenser as a human-centric device designed to administer medication more easily and accurately, while continuing to depict the Promoted Device rather than the under-FDA-review MydCombi cartridge/base configuration.

73.    In August and September 2022, Eyenovia-related public materials described the Optejet dispenser as administering ophthalmic solution horizontally by precision spray and as designed so patients could benefit from an easier-to-use lower-dose spray.

17

74.     On or about October 17, 2022, Eyenovia issued or caused to be issued public materials describing the investigational Optejet dispenser as a human-centric design that could make treatments for myopia, presbyopia, and mydriasis easier to deliver.

75.     The October 2022 materials stated that, in one study, 95% of patients successfully self-administered doses on the first attempt, and that children in another study had high compliance using Optejet once daily.

76.     The October 2022 materials also stated that Optejet had not been approved, cleared, or licensed by FDA and was not commercially available in the United States.

77.     Those self-administration, child-compliance, and adherence statements further reinforced the impression that the device being promoted to investors and patients was the device associated with MydCombi's FDA-review and FDA-approval pathway and that Optejet could support a broader patient-use market opportunity beyond office-administered MydCombi.

**F.      FDA Approval Was Specific to the Approved Device**

78.     FDA approval of MydCombi was not a general approval of all Optejet devices or future Optejet configurations.

79.     FDA materials described the proposed and approved MydCombi product as a drug-device combination involving a MydCombi cartridge holding the drug solution and an Optejet base supplying power to the dispenser.

80.     Approved labeling likewise treated MydCombi as a product-specific cartridge/base system, not as approval of any later-generation Optejet platform device.

81.     The first public regulatory image of the Approved Device appeared in FDA-approved labeling and instructions for use in connection with the May 2023 approval.

82.     The FDA-approved labeling and instructions for use showed the MydCombi dispenser, including its fill button, mist opening/light, mirror, battery light, mist button, release tab, and charging port. The instructions for use also showed the MydCombi cartridge and base as separate parts of the assembled dispenser.

83.     The FDA-approved labeling and instructions for use showed a device configuration materially different from the Promoted Device shown in Eyenovia's December 2021 investor presentation and related public-facing materials.

84.     The earliest company presentation presently known to Plaintiff that depicted the Approved Device was Eyenovia's August 2023 Investor Presentation,

which was furnished to the SEC after Plaintiff's December 2021 and April 2023 purchases.

85.     Eyenovia's November 13, 2023, investor presentation contained a clearer labeled depiction of the Approved Device, showing the MydCombi cartridge, base, fill button, mist button, and base unit with rechargeable battery.

86.     Eyenovia's January 2024 investor presentation used an even clearer labeled version of the Approved Device.

**G.    May 2023: Eyenovia Reinforced the Misleading Platform-Validation Message**

87.     On May 8, 2023, Eyenovia announced FDA approval of MydCombi.

88.     Eyenovia represented that MydCombi was the first product using its proprietary Optejet device to be approved by any regulatory authority.

89.     Eyenovia further represented that FDA approval of MydCombi provided critical validation of the Optejet platform.

**H.    Subsequent Disclosures Confirmed That the Promoted Second-Generation Device Required Separate Regulatory Work**

90.     Eyenovia disclosed that the second-generation Promoted Device had significantly lower manufacturing cost than the currently approved product.

91.     In 2024, Eyenovia disclosed that FDA had provided comments regarding a clinical bridging study to transition MydCombi from the Approved

Device into the second-generation Promoted Device, which had lower manufacturing cost than the currently approved product.

92.    On August 12, 2024, Eyenovia announced that, following FDA consultation and a July FDA meeting, it planned to validate the advanced second-generation Promoted Device and make a 2025 regulatory submission with MydCombi as the lead product. Eyenovia also stated that the device was designed to be easier to use and manufacture and to bring cartridge cost toward the Company's goal of $20.

93.    In October 2024, Eyenovia announced the commencement of manufacturing of the advanced second-generation Promoted Device and stated that MydCombi registration batches would undergo 12 months of stability and functional testing in that device, with a potential supplemental NDA filing expected thereafter.

94.    In February 2025, Eyenovia announced progress on a next-generation user-filled Optejet dispensing device and stated that it planned to seek regulatory approval for that device. That later concept added user-fill capability that the December 2021 presentation had not described or promoted for the Promoted Device.

95.    Subsequent Hyperion disclosures stated that MydCombi was delivered using technology nearly identical to first-generation Optejet technology.

21

MydCombi itself was not a user-filled device. The Approved Device was a product-specific MydCombi cartridge/base configuration using a prefilled MydCombi cartridge, while the separately described user-filled concept involved a cartridge filled from separately supplied topical ophthalmic liquids. Plaintiff alleges that the Promoted Device was the second-generation configuration shown to investors, not the later user-filled implementation.

96.     In its 2025 Form 10-K, Hyperion stated that it was developing a proprietary user-filled Optejet device and anticipated registering a second-generation user-filled Optejet device as a liquid drug-delivery device based on its experience with MydCombi. Those statements confirmed that user-fill was a separately described functionality requiring development and registration; they did not mean that MydCombi or the Promoted Device shown in December 2021 was user-filled.

97.     By 2026, Hyperion disclosed that it expected substantially all assets and operations related to Optejet to be wound down during the second quarter of 2026, further confirming the materiality of the distinction between the Promoted Device and the product actually approved and commercialized.

**I.     The Approved MydCombi Product Had Inferior Commercial Economics Pending Transition to the Promoted Device**

98.     Eyenovia's later financial disclosures confirmed that the distinction between the Approved Device and the second-generation Promoted Device was economically material.

99.     The December 2021 investor presentation represented that Eyenovia's platform opportunities could produce estimated gross margins of 82% to 94% at scale. In the context of Eyenovia's device imagery, Optejet platform language, and MydCombi FDA-review statements, those estimates associated the Promoted Device and Optejet platform with high-margin commercial economics. The presentation did not clarify that the estimates were not descriptions of the Approved Device's early commercial economics. Subsequent disclosures showed that the Approved Device produced flat or negative early gross margins and that improved economics depended on transitioning MydCombi into the second-generation Promoted Device, scaling production, and completing additional FDA-reviewed regulatory work.

100.    In November 2023, after its initial targeted launch of MydCombi, Eyenovia reported $1,198 of revenue and $1,198 of cost of revenue for the third quarter of 2023, producing no gross profit.

101.    At the same time, Eyenovia stated that it had advanced the second-generation Promoted Device and anticipated shipping it to MicroPine partners by

year-end 2023. Defendant Rowe stated that the Company had made the strategic decision to prioritize current second-generation Optejet manufacturing capabilities.

102. In May 2024, Eyenovia disclosed that revenue for the first quarter of 2024 totaled $4,993 and was offset by cost of revenues of $4,993. Eyenovia further disclosed that it expected to generate flat gross margins during the early stages of MydCombi commercialization until it could roll out the second-generation Promoted Device and scale production.

103. That disclosure showed that the Approved Device did not provide the improved economics Eyenovia associated with the second-generation Promoted Device. The Company's ability to improve product economics depended on transitioning MydCombi into that device and scaling its production.

104. In August 2024, Eyenovia disclosed that revenue for the second quarter of 2024 totaled $22,625 and was offset by cost of revenues of $490,361, resulting in a gross loss. Eyenovia attributed the negative gross loss primarily to write-downs of commercial inventory, including short-dated inventory, but the disclosure further demonstrated that the approved MydCombi configuration was not economically scalable on the terms investors had reasonably understood from Eyenovia's platform-validation statements.

**J.    Device-Comparison Allegations**

105.    Exhibit A shows the Promoted Device from Eyenovia's December 6, 2021, SEC-filed investor presentation. That slide described Optejet as "Microdose Array Print" technology designed for optimal drug delivery and visually showed the sleek Optejet device Eyenovia promoted to investors as its proprietary platform technology.

106.    Exhibit B shows the Approved Device from FDA-approved labeling and instructions for use. The FDA-approved labeling described MydCombi as packaged in a dispenser with two parts: the cartridge that holds the drug solution and the base that holds electronics. The FDA-approved labeling showed the MydCombi cartridge, the MydCombi base, and the assembled dispenser.

107.    Exhibit C shows a same-page comparison of the Promoted Device and the Approved Device. It shows the visual distinction between the Promoted Device and the Approved Device.

108.    Separately, the text accompanying the Promoted Device in the December 6, 2021, investor presentation described smart-device pairing, dosage reminders, dose tracking, data capture, and patient/child compliance and adherence functionality that the FDA-approved MydCombi labeling and instructions for use did not approve or describe for the Approved Device. The same presentation also tied high-value Optejet platform opportunities to estimated at-scale gross margins

of 82% to 94%, while subsequent disclosures showed that the Approved Device could not generate those platform economics without transition into the second-generation Promoted Device, scaled production, and additional FDA-reviewed work.

## VI. PLAINTIFF'S TRANSACTIONS

109.   Plaintiff's Eyenovia purchases were as follows:

110.   On December 16, 2021, Plaintiff purchased 20,000 shares of Eyenovia common stock in Account ####9166 for $73,000.00, at $3.65 per share.

111.   On April 6, 2023, Plaintiff purchased 229 shares in Account ####1678 for $856.46, at $3.74 per share.

112.   On April 6, 2023, Plaintiff purchased 18,561 shares in Account ####1678 for $69,603.75, at $3.75 per share.

113.   On April 6, 2023, Plaintiff purchased 179 shares in Account ####9166 for $667.65, at approximately $3.7299 per share.

114.   On April 6, 2023, Plaintiff purchased 13,871 shares in Account ####9166 for $52,016.25, at $3.75 per share.

115.   On April 6, 2023, Plaintiff purchased 100 shares in Account ####9166 for $372.00, at $3.72 per share.

116.   On April 6, 2023, Plaintiff purchased 1,350 shares in Account ####9166 for $5,035.50, at $3.73 per share.

117.   On April 6, 2023, Plaintiff purchased 6,288 shares in Account ####4430 for $23,580.00, at $3.75 per share.

118.   On April 6, 2023, Plaintiff purchased 2 shares in Account ####4430 for $7.48, at $3.74 per share.

119.   Plaintiff purchased a total of 60,580 Eyenovia shares for $225,139.09.

120.   Plaintiff has not sold any shares. All shares remain held and were converted into Hyperion DeFi / HYPD shares.

## VII. DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A.    The December 6, 2021, Investor Presentation

121.   The December 6, 2021, investor presentation was materially false and misleading because it used Optejet platform language and device imagery while stating that MydCombi was under FDA review as a drug-device combination product.

122.   Defendants omitted that the device image presented to investors did not match the Approved Device for which FDA approval was being sought.

123.   Defendants also omitted that the Promoted Device was not the device then under FDA review for MydCombi. Subsequent disclosures showed that transitioning MydCombi from the Approved Device into the Promoted Device required additional development and FDA-reviewed regulatory work.

27

124. Eyenovia's December 6, 2021, Optejet platform statements were also misleading because they attributed smart-device pairing, dosage-reminder, dose-tracking, and data-capture functionality to the Optejet platform shown to investors, while failing to disclose that the Approved Device did not include that functionality.

125. Those statements were also misleading because the December 2021 investor presentation associated Optejet with improved compliance and adherence, including nearly 90% compliance among children using Optejet once daily. The Approved Device did not provide that patient-use or child-use functionality. It was a product-specific, professionally administered, office-use mydriasis device, not a daily or chronic self-administration device for children or other patients.

126. Those statements were further misleading because the December 2021 investor presentation presented estimated at-scale gross margins of 82% to 94% for Optejet platform opportunities without clarifying that those platform-level estimates were not descriptions of the Approved Device's early commercial economics. Subsequent disclosures showed that the Approved Device produced flat or negative early gross margins and that improved economics depended on transitioning MydCombi into the second-generation Promoted Device, scaled production, and additional FDA-reviewed work.

127. Defendants affirmatively chose to depict a specific Optejet device, describe its platform capabilities, and state that MydCombi was under FDA review as a drug-device combination product. That combination of imagery and statements created the materially misleading impression that the depicted device was the device constituent under FDA review, while omitting the materially different Approved Device.

## B.    Continuing Optejet Platform Statements

128. After December 2021, Eyenovia continued to describe Optejet as a proprietary platform and to position MydCombi as an FDA-review or FDA-approval drug-device product using Optejet technology.

## C.    Pre-April 2023 Statements Were Misleading in Light of the Device-Constituent FDA Review

129. Defendants' pre-April 2023 Optejet and MydCombi statements were materially misleading because, after FDA treated MydCombi as a drug-device combination product and requested additional device-related work, Eyenovia continued to promote Optejet using the Promoted Device without clearly disclosing that the device constituent submitted for FDA review was the materially different Approved Device.

130. Because Eyenovia had made Optejet central to its platform narrative, and because the pending FDA action was understood to concern the Optejet

dispenser/device constituent, Defendants had a duty to disclose that the device shown and promoted to investors was not the device configuration being reviewed by FDA.

## D.   Patient Self-Administration and Use Statements

131.   Eyenovia's patient self-administration and use-related statements were also materially misleading because they promoted the Promoted Device as easy to use, patient-friendly, and capable of self-administration without clearly disclosing that the device shown and promoted was not the Approved Device.

132.   Eyenovia's October 2022 public materials acknowledged that Optejet had not been approved, cleared, or licensed by FDA and was not commercially available in the United States. That statement made it even more important for Eyenovia to distinguish the investigational Promoted Device from the specific MydCombi cartridge/base configuration later submitted to and approved by FDA.

## E.   The May 8, 2023, FDA Approval Announcement

133.   On May 8, 2023, Eyenovia announced FDA approval of MydCombi.

134.   Eyenovia stated that MydCombi was the first product using the Company's proprietary Optejet device approved by any regulatory authority.

135.   Eyenovia further represented that FDA approval of MydCombi provided critical validation of the Optejet platform.

136. These statements were materially misleading because they omitted that FDA approval of MydCombi was approval of the Approved Device and not approval or validation of the Promoted Device.

137. The statements also omitted that use of MydCombi with the second-generation Promoted Device would require additional FDA interaction, clinical bridging, validation, stability testing, manufacturing work, and regulatory submission.

138. Defendants' platform-validation statements were also misleading because they did not distinguish the Approved Device's early commercial economics from the economics Eyenovia later associated with the second-generation Promoted Device. Subsequent disclosures showed that the Approved Device generated flat early gross margins and that improved economics depended on transitioning MydCombi into and scaling production of the Promoted Device.

139. Having chosen to represent that MydCombi's approval provided critical validation of Optejet and supported the Company's platform opportunity, Defendants were required to disclose facts necessary to prevent that statement from implying that FDA had approved the same device configuration and broader capabilities previously promoted to investors.

140. A reasonable investor evaluating Eyenovia as a proprietary ophthalmic device-platform company would have considered it important whether

31

FDA was reviewing and approving the same device Eyenovia depicted and associated with its broader platform capabilities. That fact bore directly on the scope of regulatory validation, the functionality and users supported by the approved product, the commercial opportunity being validated, and the value of Eyenovia's central technology platform.

## F.    May 2024 and August 2024 Disclosures

141.   In 2024, Eyenovia began to disclose facts showing that the second-generation Promoted Device was distinct from the Approved Device.

142.   These partial disclosures revealed that the Promoted Device had lower manufacturing cost than the Approved Device and that Eyenovia needed to work with FDA to transition MydCombi into the Promoted Device.

143.   In August 2024, Eyenovia disclosed that FDA comments outlined a clinical bridging study to transition MydCombi into the second-generation Promoted Device, which had lower manufacturing cost than the currently approved product.

## G.    Present-Tense Statements and Omissions

144.   The challenged statements, images, and omissions concerned present facts: the identity, capabilities, and regulatory status of the Optejet device then under FDA review with MydCombi.

145.    General warnings concerning regulatory, development, manufacturing, or commercial risks did not disclose the specific omitted fact that the device shown and promoted to investors was materially different from the MydCombi device constituent then under FDA review.

## VIII. TABLE 1 - CHALLENGED STATEMENTS AND OMISSIONS

146.    Plaintiff identifies the following challenged statements, images, omissions, and corrective or partially corrective disclosures:

33

Case 1:26-cv-06476-UA    Document 1    Filed 07/27/26    Page 34 of 52

| Date / Document | Defendant(s) / Speaker | Challenged Statement or Image | Why It Was Misleading (Including Material Omissions) | Later Revealing Facts / Corrective or Partial Corrective Disclosure |
|---|---|---|---|---|
| December 6, 2021, Form 8-K and Investor Presentation | Eyenovia; Gandolfo signed the Form 8-K; Ianchulev was CEO, CMO, and co-founder and was identified in the presentation; and Rowe was COO and was identified in the presentation | Eyenovia furnished a corporate update presentation for use with investors and analysts. It showed the Promoted Device, described Optejet as proprietary Microdose Array Print technology, represented that Optejet could pair with smart devices for dosage reminders and tracking, stated that patent protection covered data capture, and associated Optejet with improved compliance and adherence. | The presentation linked MydCombi's FDA-review status to the Promoted Device and its broader platform capabilities. It omitted that FDA was reviewing a materially different MydCombi cartridge/base configuration and that the Approved Device did not include the promoted smart-device, data-capture, or daily/chronic patient-use functionality. | May 2023 FDA-approved labeling established the Approved Device's product-specific cartridge/base configuration but is pleaded as regulatory evidence, not the principal corrective disclosure. May 11–12, 2023, partially revealed that the second-generation Promoted Device still required human-factors and clinical work. May 15–16, 2024, revealed flat early MydCombi gross margins and dependence on rollout of the Promoted Device. August 12–13, 2024, revealed that transition into the Promoted Device required additional FDA-reviewed work and that the Promoted Device had lower manufacturing cost. |
| December 6, 2021, Investor Presentation — Investment Highlights | Eyenovia; Gandolfo signed the Form 8-K; and Ianchulev was CEO, CMO, and co-founder and was identified in the presentation | The presentation stated that MydCombi for mydriasis was "Under FDA review" and described Eyenovia as transforming ophthalmology through its proprietary Optejet technology. | In context, the statement connected MydCombi's FDA review to the Optejet platform and device shown in the same presentation without disclosing that FDA was reviewing the materially different Approved Device. | See the May 2023, May 2024, and August 2024 disclosures summarized in the first row. Those disclosures progressively revealed that MydCombi approval did not extend to the second-generation Promoted Device and that device configuration affected both regulatory status and commercial economics. |
| December 6, 2021, Investor Presentation — Optejet Platform / Potential High-Value Opportunities | Eyenovia; Gandolfo signed the Form 8-K; and Ianchulev was CEO, CMO, and co-founder and was identified in the presentation | The presentation stated that Eyenovia's microdose therapeutics were regulated as drug-device combination products, with CDER oversight and input from FDA device reviewers, and estimated platform gross margins of 82% to 94% at scale. | These present-tense regulatory and platform-economics statements reinforced that the depicted Optejet device was the relevant FDA-reviewed device constituent and associated the promoted platform with high-margin economics. Eyenovia omitted that FDA was reviewing the Approved Device and that the Approved Device's early commercial economics differed materially from the broader platform economics being promoted. | See the May 2023, May 2024, and August 2024 disclosures summarized in the first row. The May 2024 disclosure specifically revealed flat early gross margins until rollout and scale-up of the second-generation Promoted Device; the August 2024 disclosure revealed the additional FDA-reviewed transition work. |
| March 31, 2023, Form 10-K | Eyenovia; Rowe signed as CEO and principal executive officer; Gandolfo signed as CFO and principal financial and accounting officer; and Ianchulev signed as a director | Eyenovia stated that it had resubmitted the MydCombi NDA and that FDA was reviewing the application with a May 8, 2023, PDUFA target date. | By April 2023, Plaintiff understood the pending action as a device-constituent and dispenser-validation event. Eyenovia continued to use broad Optejet platform language without disclosing that FDA was reviewing the Approved Device rather than the Promoted Device Plaintiff had seen and relied upon. | See the May 2023, May 2024, and August 2024 disclosures summarized in the first row. Those disclosures progressively revealed that MydCombi had not been approved in the second-generation Promoted Device and that transition into it required additional FDA work. |
| May 8, 2023, FDA Approval Announcement | Eyenovia | Eyenovia announced FDA approval of MydCombi and represented that it was the first approved product using Eyenovia's proprietary Optejet device and that approval provided critical validation of the Optejet platform. | The announcement reinforced the impression that FDA had validated the same device and broader capabilities previously promoted. It omitted that approval was limited to the product-specific Approved Device and did not approve or validate the Promoted Device. | See the May 2023, May 2024, and August 2024 disclosures summarized in the first row. The May 11, 2023, disclosure was especially relevant because it showed, immediately after approval, that the second-generation Promoted Device still required further work. |

34

| Date / Document | Defendant(s) / Speaker | Challenged Statement or Image | Why It Was Misleading (Including Material Omissions) | Later Revealing Facts / Corrective or Partial Corrective Disclosure |
|---|---|---|---|---|
| January 2024 Investor Presentation | Eyenovia | Eyenovia titled the presentation "We Are the Optejet Company" and stated that Eyenovia was "the Optejet Company." | The statement confirmed Optejet's centrality to Eyenovia's identity and valuation and therefore the materiality of the device mismatch. It is pleaded as confirmation of materiality and scienter, not as a pre-purchase misstatement. | The May and August 2024 disclosures undermined the platform-validation narrative by revealing the Approved Device's weak early economics and the additional FDA-reviewed work required for the second-generation Promoted Device. |
| May 2024 Form 10-Q / Q1 2024 Results | Eyenovia | Eyenovia disclosed that MydCombi revenue was offset by cost of revenue and that flat gross margins were expected during early commercialization until rollout of the second-generation Promoted Device and scaled production. | The disclosure partially revealed that the Approved Device did not provide the commercial economics investors had associated with the Promoted Device and Optejet platform validation. It did not fully disclose that the Promoted Device differed from the device FDA had reviewed and approved. | The May 15 disclosure was issued after market close. The stock declined from $84.80 on May 15 to $65.67 on May 16, 2024, a 22.56% decline. The August 2024 disclosure later supplied additional regulatory information concerning clinical bridging and lower manufacturing cost. |
| August 12, 2024, Form 8-K / Q2 2024 Results | Eyenovia; Rowe was expressly quoted | Eyenovia disclosed that FDA had provided comments outlining a clinical bridging study to transition MydCombi into the second-generation Promoted Device, which had significantly lower manufacturing cost than the Approved Device. The SEC-filed release also stated that, following FDA consultation, Eyenovia planned validation of Gen-2 and a 2025 regulatory submission with MydCombi as the lead product. | The disclosure revealed that MydCombi had not already been approved in the second-generation Promoted Device and that transition into it required additional FDA-reviewed work. It also connected that regulatory limitation to the Promoted Device's lower manufacturing cost. | The August 12 disclosure was issued after market close. The stock declined from $70.24 on August 12 to $63.86 on August 13, 2024, a 9.08% decline. On October 1, 2024, Eyenovia further disclosed that registration batches would require 12 months of stability and functional testing before a potential supplemental NDA filing. |

35

## IX. SCIENTER

147.   Defendants knew, or were reckless in not knowing, that the December 2021 investor presentation and subsequent Optejet platform statements were materially misleading.

148.   Defendants knew the device image shown to investors did not match the specific MydCombi cartridge/base configuration under FDA review.

149.   Eyenovia knew this because it was directly involved in the MydCombi NDA, the MydCombi dispenser design, human-factors work, FDA communications, labeling, manufacturing, and regulatory strategy.

150.   Defendants also knew that FDA was reviewing MydCombi as a drug-device combination product and that the device constituent and user interface were central to FDA review.

151.   Defendants knew that the difference between the Promoted Device and the Approved Device was material because Eyenovia's value proposition depended on Optejet platform validation, manufacturability, scalability, gross margins, and partnership opportunities.

152.   Defendants nevertheless continued to present Optejet as a unified platform without clearly disclosing the material device-configuration and regulatory-status distinction.

36

153.   By December 6, 2021, the relevant MydCombi device configuration was not hypothetical or unknowable. MydCombi had already been studied in completed Phase 3 clinical trials, and FDA had already issued a Complete Response Letter treating MydCombi as a drug-device combination product and requiring additional device-related testing concerning the Optejet dispenser, while not requiring additional clinical efficacy studies of the MydCombi formulation. Defendants therefore knew the device configuration involved in the MydCombi clinical and regulatory pathway when Eyenovia showed investors the Promoted Device and described MydCombi as under FDA review.

154.   The inference of scienter as to Ianchulev rests on his particular responsibilities and the timing of the December 2021 presentation. At that time, Ianchulev simultaneously served as Chief Executive Officer and Chief Medical Officer, was a co-founder of Eyenovia, and was identified in the presentation itself. FDA had already treated MydCombi as a drug-device combination product and required additional device-related work concerning the Optejet dispenser. Plaintiff alleges that Ianchulev knew, or was reckless in not knowing, whether the device depicted to investors matched the device constituent under FDA review.

155.   The inference of scienter as to Gandolfo rests on the particular disclosures he signed. Gandolfo signed the December 6, 2021, Form 8-K furnishing the challenged presentation for use with investors and analysts. He later

signed the March 31, 2023, Form 10-K as Chief Financial Officer and Principal Financial and Accounting Officer after FDA had treated MydCombi as a drug-device combination product, requested additional dispenser-related work, and accepted the resubmitted application for review. Plaintiff alleges that Gandolfo knew, or recklessly disregarded, whether the signed disclosures omitted the material device distinction alleged in this Complaint.

156.   The inference of scienter as to Rowe rests on his particular roles, signed disclosures, and expressly attributed statements. Rowe served as Chief Operating Officer when the December 2021 presentation was furnished. He later served as Chief Executive Officer and Principal Executive Officer and signed the March 31, 2023, Form 10-K before Plaintiff's April 6, 2023, purchase. Rowe's August 12, 2024, statement following Eyenovia's FDA consultation further confirmed his knowledge that the second-generation Promoted Device required finalization and a later regulatory submission with MydCombi as the lead product. Plaintiff pleads that later statement as evidence of knowledge, not as proof by hindsight that every earlier statement was fraudulent.

157.   Defendants also knew, or were reckless in not knowing, that the distinction between the Approved Device and the second-generation Promoted Device was material to product economics. Eyenovia's later disclosures confirmed that early MydCombi sales generated no gross profit and that improved economics

depended on transitioning MydCombi into the Promoted Device and scaling production.

158.   The inference of scienter rests on the Individual Defendants' particular responsibilities, the filings they signed, statements expressly attributed to them, the centrality of the device constituent to the MydCombi FDA process, and Eyenovia's later acknowledgment that MydCombi required additional FDA-reviewed work before it could be transitioned into the Promoted Device.

159.   Defendants' knowledge is also supported by the chronology of device imagery. Eyenovia showed investors the Promoted Device before Plaintiff's purchases, while the first public regulatory image of the Approved Device appeared only with FDA-approved labeling, and the earliest company investor presentation depicting the Approved Device was furnished only after Plaintiff's purchases.

160.   Defendants' scienter is further supported by Eyenovia's own description of itself as "the Optejet® Company." That description confirms that Optejet was central to the Company's identity, valuation, financing prospects, customer messaging, and investor narrative.

161.   Defendants' scienter is further supported by the regulatory posture before Plaintiff's April 6, 2023, purchase. By that time, Eyenovia knew that the MydCombi FDA process had focused on the device constituent and Optejet

dispenser portion of the drug-device combination product, including human-factors validation, labeling, and safe and effective use of the proposed device configuration.

162. Defendants nevertheless failed to disclose clearly before Plaintiff's April 6, 2023, purchase that FDA was reviewing the Approved Device, not the Promoted Device.

163. The scienter inference rests on the defendant-specific facts alleged above and the configuration-specific FDA process, rather than generalized corporate motives.

## X. RELIANCE

164. Plaintiff purchased Eyenovia common stock after Defendants' materially false and misleading statements and omissions entered the market.

165. Plaintiff purchased Eyenovia common stock on December 16, 2021, after the December 6, 2021, investor presentation was filed and disseminated.

166. Plaintiff saw and reviewed the December 6, 2021, investor presentation before purchasing Eyenovia shares on December 16, 2021.

167. Plaintiff purchased those shares because he was intentionally seeking proprietary device companies that could create barriers to entry through FDA-approved delivery-device technology.

168.    Plaintiff purchased additional Eyenovia common stock on April 6, 2023, in anticipation of FDA action on the device constituent and Optejet dispenser issue in the resubmitted MydCombi NDA.

169.    Plaintiff understood Eyenovia's public statements and device imagery to mean that FDA approval would validate the Optejet device Eyenovia had shown investors.

170.    Plaintiff did not know that FDA was reviewing and later approved a materially different MydCombi cartridge/base configuration.

171.    Plaintiff's reliance was both market-based and direct. Plaintiff relied on the integrity of the market price, and he also directly relied on Eyenovia's public Optejet and MydCombi representations in deciding to purchase shares on December 16, 2021, and additional shares before the anticipated FDA decision.

172.    Had Plaintiff known that FDA was not reviewing the Promoted Device, but instead was reviewing the materially different Approved Device, Plaintiff would not have purchased Eyenovia shares on the same terms.

173.    Eyenovia common stock traded on Nasdaq in an open and developed market.

174.    Plaintiff relied on the integrity of the market price when purchasing Eyenovia shares.

41

175.   Plaintiff also reviewed and relied on the substance of Eyenovia's public statements concerning Optejet, MydCombi, FDA review, FDA approval, platform validation, patient self-administration, device usability, commercial economics, and the Company's commercial opportunity.

## XI. LOSS CAUSATION AND DAMAGES

176.   Defendants' misstatements and omissions artificially inflated the price of Eyenovia common stock.

177.   The artificial inflation concerned the market's understanding of the regulatory status, commercial readiness, platform validation, manufacturing cost, gross margin profile, scalability, and usability of the Optejet device promoted to investors.

178.   The truth was revealed through partial corrective disclosures concerning the regulatory and economic consequences of the concealed device distinction.

179.   In May 2024, Eyenovia disclosed that early MydCombi sales produced flat gross margins and that the Company expected flat gross margins until it could roll out the second-generation Promoted Device and scale production.

180.   The May 2024 disclosure was released after market close. The stock declined from a split-adjusted close of $84.80 on May 15, 2024, to a split-adjusted close of $65.67 on May 16, 2024, a decline of approximately 22.56%.

42

181.   On August 12, 2024, Eyenovia disclosed that transitioning MydCombi into the second-generation Promoted Device required FDA-reviewed clinical bridging and later regulatory submission, and that the Promoted Device had lower manufacturing cost than the Approved Device. The disclosure revealed that the already-approved MydCombi product could not simply be transferred into the Promoted Device without additional FDA-reviewed work.

182.   The August 12, 2024, disclosure was released after market close. The stock declined from a split-adjusted close of $70.24 on August 12, 2024, to a split-adjusted close of $63.86 on August 13, 2024, a decline of approximately 9.08%.

183.   Together, the May and August 2024 disclosures partially revealed that the Approved Device was not the second-generation Promoted Device, that transition into the Promoted Device required additional FDA work, and that obtaining the manufacturing and commercial benefits associated with the Promoted Device depended on completing that work.

184.   Plaintiff suffered direct economic loss because he purchased Eyenovia common stock at artificially inflated prices and held those shares after the concealed regulatory and economic facts were partially revealed and the artificial inflation was reduced or removed.

185.   Plaintiff has not sold any shares. His damages will be calculated under applicable law based on the artificial inflation paid at purchase, the reduction or

removal of that inflation following corrective and partially corrective disclosures, the market price of the securities, and the applicable statutory damages framework.

## XII. TIMELINESS OF CLAIMS

186.   Plaintiff's federal claims are timely under 28 U.S.C. § 1658(b).

187.   The earliest challenged statement was issued on December 6, 2021, and Plaintiff brings this action within five years of that statement.

188.   Plaintiff first discovered the facts underlying the alleged device mismatch on or after August 12, 2024, when Eyenovia disclosed that transitioning MydCombi into the second-generation Promoted Device required additional FDA-reviewed validation, clinical bridging, and regulatory submission. That disclosure caused Plaintiff to recognize that MydCombi had not been approved in the device Eyenovia had previously shown and promoted to investors.

189.   Before that disclosure, Plaintiff did not know that the Promoted Device was the second-generation Optejet device or that MydCombi had been reviewed and approved only in a materially different configuration. Plaintiff brings this action within two years of that discovery and within five years of the earliest challenged statement.

## XIII. EXHIBITS

190.   Plaintiff incorporates Exhibits A through C: Exhibit A contains selected slides from Eyenovia's December 6, 2021, investor presentation depicting

44

the Promoted Device and describing the Optejet platform; Exhibit B contains excerpts from FDA-approved MydCombi labeling and instructions for use showing the Approved Device, including the cartridge, base, and assembled dispenser; and Exhibit C provides a same-page comparison of the Promoted Device and the Approved Device.

## XIV. COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants

191.   Plaintiff incorporates each preceding paragraph as if fully set forth herein.

192.   Defendants made material misstatements and omissions concerning Optejet, MydCombi, FDA review, FDA approval, device imagery, patient self-administration, child and patient compliance and adherence, smart-device pairing, dosage reminders, dose tracking, data capture, regulatory status, the second-generation Promoted Device, the later user-filled concept, manufacturing cost, commercialization, gross margins, scalability, and platform validation.

193.   Eyenovia made the challenged corporate statements contained in its SEC filings, investor presentations, press releases, and other investor communications.

194.   Gandolfo signed the December 6, 2021, Form 8-K that furnished the December 2021 investor presentation and the March 31, 2023, Form 10-K as Chief

Financial Officer and Principal Financial and Accounting Officer. Plaintiff's primary-liability allegations against Gandolfo are based on those signed statements and any other public statement expressly attributed to him.

195. Rowe signed Eyenovia's March 31, 2023, Form 10-K as Chief Executive Officer and Principal Executive Officer. Plaintiff's primary-liability allegations against Rowe are based on that signed filing and public statements expressly attributed to him. Rowe's post-purchase statements are pleaded as evidence of knowledge, materiality, corrective disclosure, or loss causation and not as statements inducing purchases that had already occurred.

196. Plaintiff alleges that Ianchulev had ultimate authority over the executive and medical statements concerning Optejet, MydCombi, and FDA review contained in the December 6, 2021, investor presentation. Ianchulev also signed Eyenovia's March 31, 2023, Form 10-K as a director.

197. Each Individual Defendant made statements he signed, statements expressly attributed to him, or statements over which he exercised ultimate authority, and acted with his own knowledge or recklessness as alleged above.

198. Defendants acted with scienter because they knew or recklessly disregarded that the statements and omissions were materially false and misleading.

199.  Defendants made the statements and omissions in connection with Plaintiff's purchases of Eyenovia common stock.

200.  Plaintiff relied on Defendants' misstatements and omissions, including through reliance on the integrity of the market price and through direct reliance on Eyenovia's public Optejet and MydCombi representations.

201.  Plaintiff suffered direct damages when the truth was revealed and Eyenovia's stock price declined as the artificial inflation was reduced or removed.

202.  By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5.

## XV. COUNT II

**Violation of Section 20(a) of the Exchange Act**
**Against Rowe, Gandolfo, and Ianchulev**

203.  Plaintiff incorporates each preceding paragraph as if fully set forth herein.

204.  The Individual Defendants were controlling persons of Eyenovia within the meaning of Section 20(a) of the Exchange Act.

205.  Rowe exercised control over Eyenovia and its public disclosures after becoming Chief Executive Officer, including the March 31, 2023, Form 10-K and later statements concerning MydCombi approval, the second-generation Promoted Device, FDA interaction, product economics, and commercialization.

206.   Gandolfo, as Chief Financial Officer, Secretary, and Principal Financial and Accounting Officer, had the power to review, approve, sign, and cause the filing of Eyenovia's SEC disclosures, including the December 6, 2021, Form 8-K and the March 31, 2023, Form 10-K.

207.   Ianchulev exercised control over Eyenovia and its executive and medical communications while serving as Chief Executive Officer and Chief Medical Officer, including communications concerning Optejet, MydCombi, and FDA review.

208.   The Individual Defendants had the power to control the particular Company disclosures identified above, through their respective executive, financial, medical, and disclosure responsibilities.

209.   Eyenovia violated Section 10(b) and Rule 10b-5 as alleged above.

210.   The Individual Defendants are liable as controlling persons for Eyenovia's violations of the Exchange Act.

## XVI. COUNT III

### New York Common-Law Fraud

### Against All Defendants

211.   Plaintiff incorporates each preceding paragraph as if fully set forth herein.

48

212.   Plaintiff pleads this claim under New York common law in addition to, and in the alternative to, his federal securities-law claims.

213.   Plaintiff's New York common-law fraud claim is based on his purchases of Eyenovia shares after direct reliance on Eyenovia's statements and imagery directed to investors.

214.   New York law applies because Eyenovia maintained its principal executive office in New York when the December 6, 2021, Form 8-K and investor presentation were issued, the challenged investor communications were New York-centered public-company communications, and the alleged fraud arose from Eyenovia's New York-based investor-disclosure activity.

215.   Defendants made material misrepresentations and material omissions of present and historical fact concerning Optejet, MydCombi, FDA review, the device shown in investor materials, the device constituent under FDA review, FDA approval, subsequent regulatory work for the second-generation Promoted Device, the later user-filled concept, product economics, and Defendants' claimed platform-validation narrative.

216.   Those misrepresentations and omissions were false or misleading when made because Defendants showed and promoted the Promoted Device while representing that MydCombi was under FDA review as a drug-device combination

product, without disclosing that the device constituent under FDA review was the materially different Approved Device.

217.   Defendants knew that the challenged statements and omissions were false or misleading, or made them recklessly, for the defendant-specific reasons alleged in the Scienter section. Each Individual Defendant is liable for statements and omissions attributable to him and for his own knowledge or recklessness.

218.   Defendants made the challenged statements and omissions for the purpose of inducing investors, including Plaintiff, to rely on Eyenovia's Optejet platform narrative, MydCombi FDA-review status, and claimed platform-validation opportunity.

219.   Plaintiff actually and justifiably relied on Defendants' misrepresentations and omissions. Plaintiff reviewed the December 6, 2021, investor presentation before purchasing Eyenovia shares on December 16, 2021, and he relied on Eyenovia's public Optejet and MydCombi disclosures before purchasing additional shares on April 6, 2023.

220.   Plaintiff's reliance was reasonable because Defendants spoke directly to investors through SEC filings, investor presentations, press releases, and public-company communications, and because Eyenovia had superior knowledge of the device constituent submitted to FDA, the device shown to investors, and the regulatory status of each device configuration.

221.   Plaintiff suffered damages proximately caused by Defendants' fraud, including out-of-pocket losses and other damages recoverable under New York law, for the reasons alleged in the Loss Causation and Damages section.

222.   Defendants' alleged conduct warrants punitive damages under New York law because it involved public-facing statements disseminated through SEC filings, investor presentations, press releases, and national securities markets to investors generally, while Defendants knew or recklessly disregarded that the device shown to investors differed materially from the device submitted to and approved by FDA. This conduct demonstrated wanton dishonesty and reckless disregard of investors' rights.

223.   By reason of the foregoing, Defendants are liable to Plaintiff for New York common-law fraud, including compensatory damages and, to the extent permitted by New York law, punitive damages.

## XVII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

A.   Awarding Plaintiff compensatory damages under federal law and New York common law against Defendants, jointly and severally to the extent permitted by law;

B.   Awarding Plaintiff punitive damages on his New York common-law fraud claim, and only to the extent permitted by New York law;

C.    Awarding prejudgment and post-judgment interest;

D.    Awarding Plaintiff his costs and reasonable attorneys' fees to the extent permitted by law; and

E.    Awarding such other and further relief as the Court deems just and proper.

## XVIII. JURY DEMAND

Plaintiff demands trial by jury on all issues so triable.

Dated: July 15, 2026          Signed: /s/ Jerald Hammann

Jerald Alan Hammann
9125 Medley Circle
Minneapolis, MN 55427
jerrympls@gmail.com
(612) 290-7282

Plaintiff